With the benefit of four decades of hindsight, the District Court has concluded that Mark Rogers' trial counsel performed sufficiently in presenting his insanity defense. But the defense that the District Court expected was not an adequate insanity defense. It was actually the ideal perfected defense that has been developed after four decades of litigation and investigation. The fact remains that counsel faced a monumental task in their defense of Mark Rogers. He had slaughtered the Strode family, three members of the Strode family, for seemingly no reason. He was tied to the scene by both forensic evidence and witness statements. Counsel was faced with how to place this information in context and correctly determined that Mark Rogers' mental state would be the key to his defense. Counsel reasonably constructed a defense that involved the presentation of three experts, two of whom would educate the jury about his schizophrenia diagnosis and the complex nature of paranoid schizophrenia, and then how his bizarre behaviors fit into that diagnosis. The third and key expert, Dr. Ira Pauly, testified that Rogers did not have the ability to understand the quality of his actions and at the time of the murder, could not understand right from wrong. In other words, the jury heard exactly the defense that counsel intended to put on. Mr. Perlman, can I ask you a preliminary question? I think we all agree that because of the history of this case, our review is not constrained by epideptics. You agree? And I thought everybody did. Here's the question I'm not sure the answer to, and I could use your help on it. With respect to the first prong of Strickland, which I guess I'll just for purposes of shorthand call the standard of care prong, how do we review the district court's finding? It heard testimony from a defense expert about the standard of care and concluded that the standard of care had not been adhered to. In most other circumstances, that kind of finding is a factual one. Is that a factual finding here? Your Honor, I would submit that that's actually a legal finding that counsel did not meet the standard. How is the district judge to know what the standard of care is unless she hears testimony about it? She could have disbelieved that testimony. She could have said, I'm sorry, Mr. Weiner, I think was the defense expert. That's not the standard of care. That's not what's required. That's, you're being much too high. But she seems to have accepted that that was the standard of care. And we can get to individual instances later, but just in general, isn't that a factual finding? Your Honor, I believe for the purposes of this appeal and this court's review, you can review the district court's decision to no vote, as well as the information that was presented at the evidentiary hearing. Ultimately, it is somewhat of a mixed question of law and fact, but Strickland still mandates that we provide some semblance of deference to counsel's decision making. Well, then that led to my next question, and this sort of gets to the heart of it. On a couple of the matters that the district court identified as falling below the standard of care, for example, not contacting Dr. Moldis, counsel said, I didn't make any decision here. I just failed to do it because I was young and inexperienced and overwhelmed with other case law. So it gets back to my first question. If there's no evidence in this record that this was a strategic decision, do we really owe deference to it as a strategic decision? Not necessarily to that point, because counsel did admit that that was a mistake. However, I believe the court should review everything in context and as a whole. Because the ultimate threat to this case is whether this, whether the insanity defense was adequately presented and given the information that was before the jury, I believe it was. Counsel, you agree, don't you, that not even contacting Dr. Moldy was a mistake? The state concedes that, yes? Not necessarily. I apologize, Your Honor. I'm not trying to deflect your question, but I wouldn't concede that it is a mistake. I would say that counsel conceded that she believes she made a mistake. I understand that. I'm asking you, do you concede that not contacting the court-appointed psychiatrists on this point, not even asking what his opinion is, was a mistake? No, because she ultimately obtained an expert who she had a reasonable basis for calling, Dr. Ira Pauly, and although it was- She never met with Dr. Pauly, right? I believe she did speak to him. I don't believe she spoke to him at length. And she never discussed on the phone with him his actual opinion, right? She did know his actual opinion because she testified that she was not going to call anyone. She didn't know the ultimate conclusion. Okay, was her not meeting with Dr. Pauly a mistake? No, I don't believe it was a mistake because Dr. Pauly ultimately testified in the manner for which he was obtained- That's a prejudice. That's a prejudice argument. If I can just separate for a second whether or not counsel fell below the standard of care in not doing these things, as opposed to whether or not in the end they made a difference. I mean, surely you'd agree that not even contacting the court-appointed psychiatrist, who turns out had examined Mr. Rogers for much longer than Dr. Pauly, who was a colleague of the person who testified for the state and thought his colleague was wrong, and who was prepared to testify that Mr. Rogers was insane. Surely that falls below the standard of care, doesn't it? Put aside whether or not it ultimately prejudiced the outcome. Putting aside whether it ultimately prejudiced the outcome, it was not the correct decision. I would agree. Well, it's not only not the correct decision, Mr. Weiner testifies, and I think if you look at any of the ABA standards, past, present, or future, not contacting someone who you know may have critical information about the case falls below the standard of care for capital counsel, doesn't it? And while I tend to agree, I think the question, I think it's, when I apologize, I believe you do need to consider the prejudice aspect of that. Sure, now I want to get to that, but that's what, I don't ever get to that if I can't find a departure from the standard of care. So let's just assume for purposes of my next question, that there was a departure from the standard of care. And why wasn't it, why didn't that hurt the defense in this case? Why shouldn't it, in the description of the Supreme Court and talking about reasonable probability, undermine my confidence in the outcome of this case? The state said, oh, you shouldn't believe Dr. Hurley because he's being paid. He didn't spend a lot of time with this person. You should believe Dr. Guthrie, I guess is his name, because, well, you should believe him. And you have a colleague of Dr. Guthrie's who says, oh, he's just wrong about this. He wasn't faking it, he isn't saying. Why doesn't that at least give rise to a reasonable probability? Because it wasn't only Mr., it wasn't only Dr. Moldy who testified that Dr. Guthrie was wrong. It was all three of the defense experts that all testified that Dr. Guthrie was wrong. And ultimately at the evidentiary hearing, Dr. Moldy himself testified that he would not have presented any information that was different than what Dr. Pauley ultimately testified to. And he referred to Dr. Pauley's performance as masterful in presenting this defense. This ultimately comes down to a question of hindsight. In hindsight, would an additional expert have been potentially beneficial? Perhaps. But could it have also been cumulative? Could he have been disregarded for other reasons, including Dr. Moldy's stated non-adherence to DSM-3 standards for diagnosing Mark Rogers? There were a multitude of other ways the state could have attacked Dr. Moldy. So counsel, as I gathered from reading the transcript, it's of all four experts. Of the four experts, there was one expert who testified as to legal insanity, correct? Rich and Guthrie didn't express an opinion on that. Pauley did. Correct. Yes. And so the petitioner is saying you have one expert who expressed an opinion. You could have had at least two, including from the court-appointed psychiatrist. Isn't two a lot better than one? Well, Your Honor, I do believe that is the perfect example of hindsight because this was Dr. Moldy and Dr. Pauley. Would both of them have testified in the same way? Could they both have been attacked in different ways? Could it have further undermined the defense? There are so many factors that we don't, that are impossible to determine. But what we should be looking at is what Dr. Pauley ultimately did, which as Dr. Moldy himself classified, a good, masterful presentation of a difficult standard and a difficult presentation of how schizophrenia works. And counsel actually had a reasonable reason for calling Dr. Pauley. She testified that she knew he was a teaching doctor, and she believed he would be the best one to set forth for a jury who did not have the background what mental illness was. But she didn't choose between them for that. I mean, district court didn't find that calling Dr. Pauley was well below the standard of care. So here's my analogy, and see if you can deal with it for me. Let's assume I have one eyewitness to an alleged event, and the second eyewitness would say exactly the same thing as the first. And need I not investigate whether there's a second eyewitness, simply because he would only confirm what the first one said? I don't believe that that's the perfect analogy to what happened. Of course it's not, because I made it up. But deal with it nonetheless. I guess my point is that even if somebody says exactly the same thing as another witness, affirming what that other witness said for the jury can be terribly important in certain cases. It can be important, but what I would say is the district court and the petitioner both also argued that the presentation of Drs. Rich and Richnack were pointless. And I wasn't asking you about that, because I'm not sure I agree. That's why I was focusing on the one area where I think we could all agree counsel fell below the standard of care. Rich and Richnack were put on to confirm that Rogers was schizophrenic, and the state was contending that he wasn't. He was just a faker. So I can understand putting them on. I wasn't focusing on that. I was focusing on the failure to even contact Dr. Moldis, let alone put him on the stand. And I apologize, Your Honor. I think I was trying to present a somewhat imperfect analogy to your analogy earlier. Maybe they shouldn't have put on the second expert. Counsel, Judge Gould, if I can interject something. Do you answer Judge Hurwitz's question? I have a question for you. I think she has, Judge Gould, unless she wants to add more. No, Your Honor. I'm happy to answer Judge Gould's question. Okay. So here's my question for you. It relates to some of the questions Judge Hurwitz and Judge Bennett were asking you about the additional witnesses that could have been called on not guilty by reason of insanity defense. My question is this. Am I correct that the prosecutor in argument to this, in argument said that we've heard that there are a dozen doctors here, but only one of them has testified on insanity? I apologize that I don't recall that exact statement. It sounds correct because there was only one doctor that testified as to insanity. And that statement I think was something like he saw 11 doctors and only one thought he was insane. Right. That was a false statement, right? If he said that because Rich and Richnack and other people testified that he was schizophrenic and they described other doctors who felt he couldn't tell right from wrong, right? Right. I think the concern was that there was right from wrong at different points. There was one psychiatrist, Dr. Pauly, who did testify that on December 2nd, 1980, Mark Rogers was legally insane. I also thought that in the cross-examination of Dr. Pauly, he was asked by the prosecutor, did anybody else say he couldn't know the difference between right and wrong? And he said, yes, there were two, Dr. Lincoln and Dr. Chappell. I apologize, your honor. I don't recall that from the record. That's something I may have overlooked. Okay. Counsel, is it, is it correct that the lead defender, Ms. Shane, did not even tell the jury about the McNaughton rule insanity defense in her opening statement? That is correct. She did not refer to the McNaughton rule in her opening statement. And she didn't refer to her opening statement and she didn't explain why testimony of Dr. Pauly was important. She did explain that the jury would hear testimony from doctors regarding Mark Rogers' mental state, but she did not tie it into the McNaughton rule. However, testimony during trial came out regarding the legal, the definition of legal insanity and the jury had, was instructed on the definition of legal insanity and Ms. Shane, in her closing, described why Dr. Pauly's testimony was important. Okay. Another question for you is this, uh, Dr., uh, the state's, the state's expert, uh, was that his name? That's right. I'm not, I'm not sure about that. That's right. But he put the personality of the witness at stake by saying he, uh, not the witness, the defendant, at stake by saying more or less that he had an anti-social personality disorder. Yeah, if I remember right. But isn't it also correct that if schizophrenia had been diagnosed, that that would cancel out the APSD or the ESPD? And if someone's schizophrenic, he would not diagnose them as having an anti-social, social personality disorder. That is correct. The diagnosis, the schizophrenia precludes or preempts the diagnosis of anti-social personality disorder. So then the question on that is why didn't Ms. Shane cross-examine the state's experts at all on that issue? And isn't that, if she didn't, isn't that deficient performance? I don't believe she, I believe she testified that she did not cross-examine them on that issue, uh, Dr. Guntright on that issue. However, Drs. Rich and Richnack both rejected the malingering diagnosis. They specifically diagnosed the schizophrenia and Dr. Rich, in particular, rejected anti-social personality disorder. So there was additional testimony turning to essentially to prejudice that Dr. Guntright was for. But didn't Dr. Guntright testify that he wasn't schizophrenic? Yes. So if somebody had put a cross-examination question to him, but if he's schizophrenic, he can't be anti-social personality. Wouldn't he have just said, yeah, okay, but I don't think he was schizophrenic. So how was that going to advance? I mean, wouldn't, wouldn't that just simply have given him another opportunity to say, yes, he's not schizophrenic? Yes. It's very likely that he would have doubled down on his ax, on his diagnosis. But if he did, if he did, then defense counsel would have been able to say, the difficulty that I have with Dr. Guntright's testimony is that it seems to leave open the possibility that you can have ASPD, even if you're schizophrenic. He didn't think this defendant was, but he didn't say, because I don't think he was schizophrenic, therefore I think he had ASPD. And if then the jury, even if they believe the two schizophrenia witnesses that he was at least as under the testimony offered by Dr. Guntright, couldn't they? He never said one excludes the other. He just said, I don't think he has one, and I think he has this. But if you accept the testimony of the other three defense witnesses that he is schizophrenic, it then excludes the ASPD diagnosis, does it not? It does. And there was never a cross-examination question posed that way. No, there was not a question about that. I don't want to leave this topic unless my colleagues, if my colleagues have further questions, but I had a question about an entirely different topic. And unfortunately, the courtroom talk is not in front of me, so I don't know how much time you have. 10 minutes, Dr. Guntright. Sorry. I'm not smart enough to be a doctor. So let me ask you this question. I don't think it should take too long. You say, and this assumes that the court was correct in granting the writ, so I know you, this is a step ahead of where you want to be, but let's assume that we found that the court correctly granted the writ. And you say, well, it shouldn't have conditioned the writ on us either retrying Mr. Rogers or agreeing to his defense of insanity. That's correct summary of your position? Essentially, yes. I don't understand how that benefits the state. Am I missing something? Right now, let's assume I think you're right and we strike that second condition. Well, then it seems to me the district court has to say, either let him go free or retry him. And you don't want to do that. So I'm trying to figure out, I mean, you may be right legally. I'm asking you whether you really want us to strike that second. Your honor, it was something that was of concern to the state in reviewing the court's decision. We weren't sure that that was within the court's authority. And given the specific relief of judging him not guilty by reason of insanity, which is within the purview of the jury in Nevada, that would lead to continued confinement. We simply asked the court to clarify whether the district court had that authority. Well, here's what I'm asking. I'm trying to help you here. I'm inclined to think you have a pretty good argument that the district court didn't have that authority. If you want us to reach it, we may well strike that condition. And then your only choice, if we grant the writ, will be to retry or set him free or subject him some civil proceedings that are really not in front of us right now. So I ask again, is that something you want us to do? No, and obviously we would prefer that you reverse the district court's grant of the writ, but we don't want Mr. Rogers released. But we do want clarification on our, ultimately on our responsibility. So counsel, wouldn't you, wouldn't the state be better off simply accepting, assuming we were going to affirm on the granting of the writ, wouldn't the state be better off accepting the petitioner's concession that the district court had the authority? Yes, potentially so. I didn't mean to take you off, far off track, but it seemed to me, you might have some legal justification for your argument, but I'm not sure winning it benefits your clients. That's why I said it has to benefit. I think that was a useful point to have made. And I think we've got the answer from the state now. On that, let me ask another question for counsel. Well, I have a lot of difficulty understanding why the, why defense counsel were contesting whether or not Rogers did this, did the murders. Because it seemed to me there was such clearly overwhelming that he did do it, that the only chance in the case was for the defense to show not guilty by reason of insanity. But am I right first that the defense counsel in part argued he didn't do it. And second, that the sort of ignored the fact that there were fingerprints of Rogers on the, on the glass jar with him and fingerprints on something else that was under the blanket with the bodies. So I believe what happened or to place in context, because not guilty by reason of insanity was such a rare verdict. And because it was so difficult to prove, it may have been reasonable to try to attack the guilt aspect of the case and not say all of Mr. Rogers eggs in one defense basket, so to speak. But if his fingerprints on the can that's found under a blanket with three dead bodies, his fingerprints are on a glass jar, that's also found there. And how can there be hope that it's determined that he's not the one who did the murders? I would submit that there was little hope of it, but I believe counsel thought there was a way to challenge it forensically and to the extent possible. But what she explained in closing ultimately was if you have found him, found that he committed this offense, then I need you to look at his mental state at the time. Counsel, is there anything in the record either before the trial court or on the habeas record that suggests that the petitioner, Mr. Rogers, wanted his counsel to concede his guilt of a capital crime? Not that I'm aware of. And in fact, Mr. Rogers declined to speak to his counsel at multiple points, and they had much difficulty trying to develop his defense. I'm sorry, I'm sorry. I was just going to say under Nevada law, did counsel have the right to make that decision for their client, that is to concede to the jury that he killed these three people without his permission? I don't believe so. And if he, if they had, I think we'd be here on a different claim. And I was just going to ask, unless I'm mistaken, the district court didn't find that to be an incident of ineffective assistance of counsel. When I noticed that too, I went back and read the district court's order. It didn't identify that as an incident of ineffective assistance, did it? No, but Mr. Weiner, the Strickland expert did testify that that fell below the standard, if I recall correctly. Yeah, which is why I sort of got back to my initial question, because the judge didn't buy all of this, all of his testimony about the standard of care, perhaps for the reason Judge Bennett identifies on that. He, the judge didn't, Judge Navarro didn't say, well, that's another reason why he behaved incompetently, if you will. Your Honor, if the court has no further questions, I'd like to reserve the remaining time if possible. You may, and also, since we used up part of your time, five minutes, let's add five minutes to the clock for rebuttal. So we'll give you seven and a half minutes when you come back. Thank you, Your Honor. And now we'll hear from Ms. Fraley. May I please report? My name is Heather Fraley, and I represent the appellee, Mark Rogers. Appellant would have this court believe that this case has everything to do with hindsight. The district court's order makes clear this case has nothing to do with hindsight. The district court looked at the trial court record, looked at the evidence and resources that were available to trial counsel, and the testimony of trial counsel and the experts, and correctly determined, in a very well-reasoned 20-page analysis, the trial counsel's performance in this case was deficient because trial counsel failed to take some very small, basic, simple steps to present their defense. And those small steps would have made a big difference in this case. For example, one of the big issues in this case has to do with Drs. Rich and Richnack, and I believe Judge Bennett and perhaps Judge Hurwitz, you suggested that Drs. Rich and Richnack may have actually offered some helpful testimony in regards to the schizophrenia diagnosis. Your Honor, as the district court held, however, while trial counsel might have taken one step forward in confirming the schizophrenia diagnosis with these experts, in so doing, they took two steps back. But that's not the test. That's not the test for ineffective assistance, and that's why I was a little troubled by relying on those two. Counsel says, the state says he's not schizophrenic at all. I could just put on one witness, Dr. Pauley, rebut that, but I've got two others who think he's schizophrenic. And so this will help rebut the state's case that he's malignant. Now, it turns out it wasn't the best strategic decision in the world, but it seems to me, at least on the record, it was made because counsel wanted to buttress the point that Mr. Rogers was in fact schizophrenic. So the fact that it doesn't work, or backfires, or... Now, not preparing the witnesses is entirely separate. Not meeting with them, doing that, that's entirely separate. But I just think, just putting on... See, this is where I have a slight disagreement with the trial court. I'm not... And with the judge who tried the case and kept saying, why are you putting these guys? The answer is because the state says he's not schizophrenic. I've got two psychiatrists who say he is. I want to make that point to the jury. So why does that fall below the standard? Just putting them on, not the question of preparation. Your Honor, because schizophrenia was never going to be enough to get trial counsel across the finish line. All of the... It was necessary, counsel. The jury was instructed here that they had to find that Mr. Rogers had a diseased or deranged condition of the mind as step one. That required, in this case, a diagnosis of schizophrenia, correct? On the fact of this case, that was the way that trial counsel decided to present... So it was necessary, but not sufficient. But it was certainly necessary. And Your Honor, our point, and I think the district court's point is, there was no reason that the schizophrenia diagnosis had to come at the expense of the ultimate issue. Dr. Moldy was available. He would have testified that not only was Mr. Rogers schizophrenic, he was also insane at the time of the offense. As Dr. Pauly testified. Yes, Your Honor. Dr. Pauly testified to those points. Unfortunately... This is why this all takes me back to Dr. Moldy. Somebody who hasn't talked to Dr. Moldy and hasn't schizophrenia is going to be a disputed issue. Dr. Guttreich doesn't think he was schizophrenic. So I ought to buttress my schizophrenia case. The difficulty with this case was that they could have buttressed it with a guy who spent a whole bunch of time with Rogers. And it was also willing to say he was insane. So it seems to me standing alone, though, the decisions for Rich and Richnack aren't the problem. The real problem is never even talking to Dr. Moldy. Your Honor, we absolutely agree that not speaking to the sole expert who was appointed to address your client's insanity absolutely fell below the standard of practice, particularly where Dr. Moldy was the first person in time to meet with Mr. Rogers. Assume that's true. Assume that's true. And the state doesn't seriously dispute that not even talking to Dr. Moldy... So it seems to me the critical issue in this case is Strickland prejudice, a reasonable probability. Help us on that issue. Tell us why you think, in the absence of that epidemic, so we're acting as if we're state Supreme Court justices, we would find reasonable probability of a different outcome. Your Honor, and I just want to make sure that this court doesn't underestimate the detrimental impact that Dr. Rich and Richnack's contrary testimony had on the jury. So during Richnack's testimony, the trial court interrupts and highlights for the jury that Dr. Richnack doesn't have an opinion on the ultimate... Yeah, by the way, I think the trial court was entirely improper in doing this, in my view, in reviewing this record. Maybe the failure of counsel to object to it is a separate issue, but I think the trial court had the left field. But counsel didn't, like, minutes after the district court said that, he said, explain why you want this guy. And they explained, and then didn't the trial judge says, well, there might be some helpful stuff there, and let him go ahead, right? Yes, Your Honor, and the point is that the district court, the trial court highlighted for the jury that Dr. Richnack did not have an opinion on the ultimate issue, the issue on which trial counsel had a burden of proof, okay? One of the two issues. Well, first they had to convince the jury that he had a diseased or deranged condition of the mind, and then they had to convince the petty jury that as a result, he either didn't know the nature and quality of his acts, or that he didn't know they were wrong. But two, because of one. Yes, Your Honor, they had to prove both points. But to the second point, that, again, primed to the jury to notice that Dr. Richnack doesn't have an opinion on that second issue. On cross-examination, when the district court asked Dr. Richnack why he doesn't have an opinion, he said, I am not able to render an opinion on that issue in this case, because Mr. Rogers cannot or will not talk about the offense. So now the jury's hearing from one of defense's own experts. This isn't the kind of case where an expert can opine on that issue. Well, he said, he said, I find it difficult to comment on his criminal responsibility, including because he didn't have the reports, right? It wasn't just, it wasn't just because Rogers didn't talk to him. It's because he also didn't have the reports, right? Your Honor, the reason that Dr., and I'll direct this court to SCOR 381, because the district attorney elicited this answer from Dr. Richnack a couple of times, and on that page, Your Honor, the district attorney asked Dr. Richnack, if you weren't able to talk to the defendant about his mental state at the time, how would you reach a conclusion? Dr. Richnack testified, I would be unable to do that because Mr. Rogers was unable or unwilling to discuss it. And the district attorney says, based on that, that is why you couldn't render an opinion. So he is clear that the reason he can't is because Mr. Rogers won't talk about it. But assuming that had no effect on the jury, then the very next defense expert gets up and says the same thing. I cannot give an opinion. Let me make a suggestion, counsel. Yes, Your Honor. In my view of this case, and I may be the only one, if Dr. Moldy wasn't, never existed, you'd have a hard time. And so for me, the real question is, and it seems to be inexcusable not to interview or call Dr. Moldy. So for me, the question that would be very helpful is, why was the failure to call him circling prejudice? We agree, Your Honor, that it was inexcusable. And the reason that that is part of the global picture of- Don't make a global picture for me. On its own, isn't it sufficient to constitute circling prejudice? Yes, Your Honor, particularly where our appellant concedes that point. Yes, we agree. That not presenting an expert who was appointed by the court, who saw Mr. Rogers a mere 40 days after the instant offense in this case, which is critical. Because the prosecutor argued, Dr. Pauly can't give an opinion on this issue. He didn't even meet Mr. Rogers until 10 months after the instant offense. And how much time did Dr. Pauly spend with Mr. Rogers? Many hours. He saw Mr. Rogers on five separate occasions between January and July of 1981. And how much time did Dr. Moldy spend with Mr. Rogers? Three and a half hours, Your Honor. And the- I think you have that backwards. Yeah, backwards. Dr. Pauly, three hours. Dr. Moldy, many hours. I'm sorry. I misheard you, Your Honor. Yes. Thank you, Judge Bennett. I apologize. Dr. Pauly spent three and a half hours. First meeting was 10 months after the offense. Dr. Moldy saw him five different times between January and July of 1981. The first meeting being a mere 40 days after the event. He testified, though, didn't he, in the habeas proceeding, that in terms of diagnosis, he would have testified to basically the same thing that Dr. Pauly did? Yes, he would have confirmed Dr. Pauly's diagnosis. And he didn't- That's the point I want you to get to. Why would that make- I'm sorry, Judge Bennett. No, no. That was what I wanted you to get to, too. If the state is right, he testified Dr. Pauly. So why would this have led to a reasonable probability of a different outcome, including where there were four experts? One of them only had an opinion on legal insanity, but three of them said he was schizophrenic. And one of them said, I have no opinion on legal insanity, but he might have been malingering. Your Honor, because where defense counsel had the burden of proof, credibility was key. And to only have one out of, as the prosecutor argued, 10 experts. And I just want to address, Judge Bennett, your question before about Dr. Pauly talking about Lincoln and Chappell. To be clear, Your Honor, what Dr. Pauly was referring to was Lincoln and Chappell's opinions on the issue of solely competency to stand trial. But he did testify that at that time, they felt he didn't know right from wrong. They testified, Your Honor, that he didn't know right from wrong at the time of their evaluation. Neither of them testified- But that's not irrelevant, right? It is not going to be enough for them to prove insanity at the time of the offense, particularly where, again, and this is critical, Your Honor, all of the experts agreed schizophrenia was not enough. You can know right from wrong and be schizophrenic. So they really- You can. All of them agree to that because it's true, right? Yes, Your Honor. It's absolutely true, which is why it was so important to have confirmed, credible testimony from doctors regarding Mr. Rogers' mental state at the time of the offense. And here, Dr. Pauly renders that opinion, seeing Mr. Rogers for the first time 10 months after the offense. Is it relevant at all here, if my math is correct, the jury on the guilt phase was out for six and a half hours? That is absolutely correct, Your Honor. Yes, it is. And isn't that indicative of their view of the strength of the government's case, both on insanity and on the merits that they were out such a short time? Your Honor, our position would be that six and a half hours is quite a long time to be out in a case where there's really no- That would have been fine too, but I normally lost these cases and Judge Bennett normally won them. So maybe we have a different perspective. Oh, we may have been on the other side of those cases, Judge Horowitz. I think an important point for this court to remember is that the state, the prosecution basically handed defense counsel their insanity defense on a silver platter. Seven of the state's own witnesses testified to Mr. Rogers' bizarre and paranoid behavior immediately before and immediately after the offense, including being arrested, hanging onto the luggage rack of a car that's driving down a four-lane highway. The jury heard all that, right? Yes, Your Honor, they did. So the jury heard all of this bizarre behavior, everything that supposedly indicated psychotic behavior, psychotic feud on the part of your client, knew that those were symptoms of schizophrenia, but were still unimpressed by that in the verdict they returned. So why is one more doctor going to lead to a reasonable probability of a different result? Your Honor, again, and I know that Judge Horowitz wanted- No, no, I don't want you to give up your entire argument, but it would be helpful to hear your answer to this question. And so my answer is that we have to look at the big picture. So why would Dr. Moldy have made a difference? Because again, he saw Mr. Rogers first in time. It's much more believable to the jury that a person who sees him within 40 days of the offense says, I've looked at all this stuff and I think that this man didn't understand or appreciate the nature or quality of his act. And again, has seen him multiple times over multiple months. Versus a man who's paid by the defense, sees him once for three hours, the first of that being 10 months later. So his credibility would have been critical in convincing the jury. But adding to that, Your Honor, if Trump counsel had performed effectively, the jury never would have heard that it was not possible for a mental health professional to render an opinion on the ultimate issue in this case. No, counsel, you say that. I didn't find that anywhere in the transcript where anyone testified it would not be possible. My reading of the transcript was we can't do it, including because we don't have the relevant history. That may be a different issue, but Dr. Pauly testified that he could do it and the other witnesses didn't testify. Somebody else couldn't do it. They only testified they couldn't do it. But Your Honor, why would the jury believe Dr. Pauly when two of the defense's own experts say it's not that they can't do it? That's not what they said. You're making a very good jury argument about it, but I'm not sure as good an appellate argument. What they said was, I can't do it because I wasn't provided with the relevant materials or given access to an interview with me. Now, that may have been a failing of counsel and that may have been a reason, although we don't know what they would have said had they been given the materials. I'm not sure that's it. But the record doesn't say they said it's impossible to tell whether somebody could tell right from wrong at the time of the crime. By a later analysis, they said we can't do it because we haven't been given the materials necessary to do it. Isn't that an accurate statement of what they said? Your Honor, they say they can't do it because Mr. Rogers wouldn't talk about it. That's right. That's the materials necessary for doing it. Now, it may be failing to prepare them or to anticipate that they wouldn't be good witnesses because they said that may be something. But they didn't say, they didn't undermine Dr. Purley's testimony that he could reach that conclusion because he had met with him. I had a specific question for you. This may be in the record, I'm just forgetting. Dr. Purley was not associated with Lending's Cross, was he? Ledge Crossing, Your Honor. Dr. Pauley was not. That's correct. Okay. But Dr. Muldy was? No. No, he was not, Your Honor. Okay. Wasn't he familiar with what went on there because of his state? He was familiar, Your Honor, by virtue of his being appointed regularly in cases like this. Okay. That's what I was trying to figure out because he testified at some length about what goes on there. I wondered whether he had any prior experience there. The answer is no. His experience, again, was by virtue of examining a lot of people there. But to go back to this point about prejudice, I'll let the rich and rich next thing go here. If we're just talking about Dr. Muldy, Dr. Pauley, why does this matter? Another critical point to this prejudice showing is the lack of preparation of Dr. Pauley. He lost a significant amount of credibility on cross-examination due to trial counsel's failure to provide him with critical documents that he admitted would have been helpful and the fact that he didn't. He said it could have been helpful. Yes, Your Honor, that's correct. He also said that he did not know where the reports of Mr. Rogers' behavior before and after the offense came from, whether they be defense investigators or prosecution investigators. That was critical. Again, the only basis for his opinion on insanity were these records, were these bystander reports. For him not to even know where those records came from was critical to his credibility. Counsel, when you say it's the only basis, my recollection is that Mr. Rogers' counsel put a variety of hypotheticals to Dr. Pauley. If I'm remembering correctly, the prosecutor didn't object to any of the hypotheticals of stating facts, not in evidence. Am I remembering that right? That is correct, Your Honor. And so there were hypotheticals of facts. The prosecutor didn't object. And in response to all of the hypotheticals, Dr. Pauley said, schizophrenic, didn't appreciate the nature and quality of his acts, didn't know right from wrong, psychotic. Is that right? Yes, he did. And he also said that being a schizophrenic didn't mean necessarily that a person couldn't know right from wrong. Because if he had said something to the contrary, he could have been impeached immediately with the DSM-3 and probably a hundred law review articles that say schizophrenics sometimes do know the difference between right and wrong. Yes, Your Honor. But instead, he was impeached on the fact that he didn't have relevant evidence and that he didn't even know where the evidence that he had came from. So Dr. Moldy would have added credibility to Dr. Pauley. If counsel had performed effectively, Dr. Pauley wouldn't have lost credibility on his own. Can I ask you a question about the cross-examination that takes me back to Dr. Pauley? I think we now all agree, and I think the state doesn't dispute this, that if you're schizophrenic, you can't have ASPD. Did counsel know that? Well, Your Honor, they had a copy of the DSM on the desk during trial. That's not what I'm asking. I mean, was there any testimony in this case that counsel had been apprised of that? Your Honor, there was testimony in this case that trial counsel was familiar with the DSM. We know from the record that trial counsel used the DSM during her... I'm asking a different question. I have no doubt counsel was negligent by not asking that question. My question is, could one reason that counsel didn't know that question, didn't ask that question was because counsel never consulted with Dr. Pauley or Dr. Moldy on that issue? I don't know what the record shows as to that. So does the record show whether or not in the brief time that counsel talked to her only expert on insanity, this issue came up? The record shows that she did not, Your Honor. The record shows that neither trial counsel consulted with Dr. Pauley about Dr. Guthrie's report about the definition of antisocial. Is there anything in this record about what either Dr. Pauley or Dr. Moldy would have told counsel about the report? Yes, Your Honor. They both testified at the evidentiary hearing that they would have explained to... And I think in particular, this came up with Dr. Pauley. Dr. Pauley testified that Dr. Guthrie didn't satisfy the diagnostic criteria, not only on this issue about schizophrenia preempting antisocial, which is very important. But the other critical point that the district court noted came out of the hearing was that the second prong of antisocial requires proof of three or more enumerated behaviors before the age of 15. Dr. Guthrie testified he didn't have any information about Mr. Rogers predating his stay at Lakes Crossing. So, yes, it was not discussed with Dr. Pauley. That was absolutely... One more record-based question. I assume there had been some disclosure before trial of what Dr. Guthrie's opinion was going to be? Absolutely, Your Honor. And trial counsel conceded that they did have that information prior to trial, yes. Did they give that report to Dr. Pauley? Dr. Pauley had, yes, Dr. Pauley had Dr. Guthrie's report. Yes, he did. He did not have the... But he said multiple times he disagreed with Dr. Guthrie, right? He said that he disagreed, although he did agree with Dr. Guthrie, and he testified that Mr. Rogers did display antisocial behaviors, and that he was a violent person. And he never... My question was really aimed at a separate point. I know he disagreed, and perhaps his testimony was enough to address the issue. I just want to know whether or not there's any evidence that counsel ever conferred with him about that disagreement. The evidentiary hearing transcript reveals that they did not. Both Dr. Pauley and trial counsel testified that they did not discuss Dr. Guthrie's report with Dr. Pauley. That has been the evidentiary hearing transcript. Dr. Pauley may have been able to reach a conclusion about the accuracy of Dr. Guthrie's diagnosis, but counsel never talked about that. That is correct, Your Honor. Nor did trial counsel bother to open the DSM while Dr. Guthrie was testifying. Yeah, I was just going to say, that impresses me less because if I open the DSM, and this gets to a separate point. Neither counsel had tried a capital case before? That's correct, Your Honor. Neither of them had. Either counsel presented an insanity defense? No, Your Honor. Neither had. I know your brief doesn't make an argument based on the ABA standards. Is that simply because this case occurred before the standards were promulgated? Well, no, Your Honor. The 1980 standards were in effect, and the 1980 standards do talk about the importance of investigating all avenues and preparing a defense. And certainly, trial counsel fell below that standard here. But our focus, as was the district court's focus, was on district and expert's testimony, which incorporated the ABA guidelines, as well as his own personal knowledge of the standard of practice at the time. Counsel, I have a question on this area that you were just touching on, your client's background as a young man and a young adult. Yes, Your Honor. Somebody discussing that in more detail would have opened up the prosecutor to himself, going into more detail about what your client had done. And isn't that a dilemma in sort of most insanity cases, where the defense wants to navigate between Till and Terribdis because they can bring that up, but then the prosecution is going to lead the jury to believe how bad a person this is, and just this person needs to stay in jail forever. Your Honor, trial counsel did bring it up. If you look at the very first defense witness, it was Mr. Rogers' mother. One of the very first things she testified to was how violent and impulsive her son was in childhood. So, trial counsel brought up the issue of violence. They introduced that to the jury. And then Dr. Pauly, didn't he testify about the, and I'm going to pronounce this, prodromal stage of schizophrenia, which dealt with his youth? Not at trial, Your Honor. No, he did not. He did not testify that the violence and impulsivity that was experienced by Mr. Rogers in adolescence and youth were prodromal symptoms. When he talked about the prodromal stage, he was talking about Mr. Rogers' behavior with Mr. Morrison. So, when he talks at trial about prodromal, he talks about Mr. Rogers' behavior in the years leading up to this with Mr. Morrison, where he threw an ashtray and he started talking about weird things. He talks about that in terms of prodromal. Was Dr. Pauly apprised of the childhood behavior? I know there was testimony about it at trial, but I assume he wasn't sitting in the courtroom. Does the record tell us whether he knew about the childhood behavior? Your Honor, from the trial record, it looks like Dr. Pauly knew some things from the records that he had and from his discussions with Mr. Rogers. But certainly, trial counsel didn't provide Dr. Pauly with in-depth background information about his childhood. But just based on defense counsel introduces the issue of violence and impulsivity to the jury through the mother. Dr. Pauly confirms that Mr. Rogers exhibited antisocial and violent behaviors. Trial counsel failed to elicit from Dr. Pauly that those were consistent with the schizophrenia diagnosis and they did not in any way confirm the antisocial diagnosis. If anything, they lended further support to the schizophrenia diagnosis because these are common behaviors that we see in preschizophrenic adolescents and youth. So the jury did not hear anything from any of the experts that would have explained Mr. Rogers' allegedly antisocial behaviors in youth in the context of the schizophrenia diagnosis. And that's another example of something that just a small step by trial counsel would have gone a long way in legitimizing the credibility of their experts' diagnoses and undermined Dr. Guttreich, which is another point we haven't spoken about yet that's relevant to both deficient performance and prejudice. But specifically to this court's about prejudice, this would have been an easy thing. Very simple, whether it involved talking to Dr. Pauly about it or it involved opening up the DSM. I know, Judge Hurwitz, you say you might not have understood the DSM if you opened it, but I'm sorry. But trial counsel used the DSM. They used the DSM during their questioning of Dr. Richnach. They even used the DSM during their cross-examination of Dr. Guttreich. It's just that they used it to no purpose. They used it to elicit from him that he didn't know what a fictitious disorder was, did nothing to undermine his credibility. Very simple. It's right there on the front of it. He didn't have sufficient information to diagnose antisocial. The diagnosis was preempted by a diagnosis of schizophrenia. The evidence in his own report contained descriptions of behaviors that were consistent with schizophrenic individuals. And this is very easy steps that could have been taken to discredit him. Let me ask you a practical question, and I don't think it bears on our decision in this case, but I want to make sure I understand where we are procedurally. If we were to reverse the granting of the writ, there would nonetheless still have to be a separate penalty trial if the state wished to pursue the death penalty. Assuming that Mr. Rogers was retried and was not found in GRI. I mean, I would say if we reverse the granting of the writ, then he would get his conviction to stand, and then there would have to be a retrial. At the retrial on the death penalty, it strikes me that the evidence would be almost precisely the same, although with different import perhaps, than it would be at trial. Do you agree or disagree? There would be a lot of similarities in terms of evidence of mental illness and the like. There would have been a lot more mitigation evidence at the penalty phase. Sure, sure. I'm thinking of the psychiatric evidence. I'm sorry, I should have said that. Yeah, but as far as mitigation, abuse, trauma. Yeah, that's a different issue. So I'm thinking out loud to myself, and as I said, it shouldn't make a difference in our thought of the outcome, but it strikes me that not much would be added to the analysis if we sent this back for a trial on the insanity defense, because the same experts would be the same ones you would call in the penalty phase. Well, and I mean, the issue before this court now is whether Mr. Rogers received a fair trial at the guilt phase, and the district court looked at the record. That takes me to the last question. What do you gain by this? I asked the state this question the other way, but what do you gain by the condition that the insanity defense be recognized? The state can always do that if it wants to, can't it? The state can always do what, Your Honor? Judge him in GRI? No, the state can agree to his plea that he's not guilty by reason of insanity, can't it? I believe that the state could agree to that, Your Honor, but that's- What do you gain by the condition? Well, what we gain, Your Honor, is that the state has a choice. The state has a choice now. They can either retry him or not retry him. If they choose to retry him, that condition goes away. If they choose to retry him, and then you get back to the superior court, the district court in Nevada, and the state says, gee, we'll accept your plea. We'll agree to it. They can do that too, can't they? Your Honor, it's all about extending resources. If the state wants to extend the resources to retry him, they can. If they don't want to, they don't have to. But do you agree they can agree with you or with defense counsel that he's not guilty by reason of insanity? There's nothing under state law that prevents them from doing that? I'm not aware of anything under state law that would prevent them from doing that, no, Your Honor, but on the facts of this case, there's- the appellant hasn't given this court a reason to reverse on that issue if the court wanted to. Give Mr. Rogers the additional- the state the additional option of releasing Mr. Rogers, and we certainly wouldn't object to that. I'm just trying to figure out why it makes a difference to either side, and I guess I've got my answer. I think it doesn't, and I think where the equities are the same, the court should affirm and leave the district court's order alone. Your Honor, so for all the reasons that we've talked about, the district court's order is amply supported. Small steps in this case would have made a big difference to the evidentiary picture before the jury, so we would ask this court to affirm the district court's amply supported order. Thank you. Thank you, counsel. Now here we'll go to Ms. Perlich, who gives a couple of extra five minutes. Thank you, Your Honor. I almost forgot to turn off mute, so that would have taken a few seconds there. What Your Honors have been speaking about, I think, is what we need to discuss now, which is regardless of whether counsel spoke to Dr. Moldy, regardless of whether Dr. Moldy testified solely or in tandem with Dr. Pauley, the facts that underlie this case would not have changed, and so the jury would still be presented with a gruesome crime scene, and to Judge Gould's point, a crime scene that had forensic evidence tying Mr. Rogers to it and establishing his guilt for the offense. There were still people who knew, who testified about things that could have been considered evidence evincing guilt, consciousness of guilt. Mr. Rogers stealing the Strode's truck, shooting at a witness as he drove away from the crime scene. These are all facts that would not change regardless of which experts were called. But that's true in every insanity defense case. I mean, normally you don't even contest the fact that the guy did it, so the alleged deficiencies here aren't remediated by the fact that it's clear that he was guilty, are they? The question is whether he should have been adjudicated not guilty by reason of insanity, not whether he should have been acquitted. Correct, but the question here for the court is whether there was a reasonable probability that he would have been a judge not guilty by reason of insanity, given additional experts who would testify, given Dr. Moldy coming in. No, I agree. That is the question, but it seems to me the overwhelming evidence that he committed the crime doesn't help us at all in answering the question, does it? The only reason I would disagree with your honor is because when looking at this reasonable probability, we have to consider everything that was in front of the jury at the time of this trial. And what I'm trying to say is you have a factual record that does not change with an additional expert. An additional expert who would have testified to the exact same information as Dr. Pauly. You still have evidence in the record that the jury could reasonably rely on to ultimately make a finding of guilt. Now we get back to my question about, and I don't have a better analogy for you, but I'll ask the same question the same way again. Two is generally better than one, and two is better than one when number two has virtues that number one doesn't have. Having seen the patient longer, having seen the patient closer to the time of the diagnosis, not being subject to the silly criticism that he's a hired gun because everybody, and I don't know why prosecutors make that argument, but everybody's a hired gun in these cases. But nonetheless, he has some virtues over number one, and virtues in testimony is the same. And on the record, I don't know what to make of the six and a half hours, on the record, this strikes me as a relatively close case on insanity. You have, I don't know, two psychiatrists say he's insane, and one psychologist says he's not. So it's certainly not a frivolous case on insanity. Given all that, why is the absence of this corroborating witness enough to give us what the Supreme Court says in Strickland is a real doubt in the, a lack of confidence in the outcome? Two may be better than one, but I would say that two is better than one when the second one does not have any criteria on which they could also be challenged. Dr. Moldy testified, there was some testimony that Dr. Moldy does not conform his diagnosis to the DSM-3 and its standards. That would have opened up an entirely different avenue to undermine his credibility for the state. I believe the problem here is that we're trying to make a one-to-one comparison, and there were different aspects to undermine both credibility. That's the subject of the adversarial system. This was placed, the information was placed before the jury, the jury simply rejected it. Well, but doesn't, the adversarial system only works when somebody has confidence. The overlay to this case that troubles me, and that's why I asked to defend Nevada. And I assume Nevada wouldn't allow this today. You've got two people defending somebody in a death penalty case who have never tried a capital case either as first or second chair before. I know you now have your own rules of that representation. I haven't followed up to when the committees come up. You have two people who've never presented an insanity defense before, and you have two people with absolutely full caseloads from which they have not been excused by the supervising agents. And then you get all these mistakes, which are perfectly predictable as a result of that kind of situation. And so that's, when you put all those together, that's what gives me a lack of confidence in the outcome. If two experienced people have made all these mistakes and thought and said they didn't think about them, I'd say, oh, you must have thought. But this really does smack of just not being given competent counsel to present a case, doesn't it? Although they had never tried a capital case and had certainly not done a not guilty by reason of insanity defense. The experience level of especially lead counsel is somewhat misleading. She had worked on mitigation in the Sacramento Public Defender's Office. She had developed, helped to develop defenses in that office. She had second chaired a first degree murder trial with her mentor when she came over to the Nevada State Public Defender's Office. It's not a capital case. I don't believe it was a capital case, but it was still a first degree murder case. Was there any evidence that either counsel, as the ABA standards suggest is required, and I think now the Nevada standards also suggest is required. I'm going looking backwards. So I'm not, is that they had any particular training in capital defense? I don't believe so, no. But even without that specific training, they still identified the correct defense, still obtained the correct types of experts, still set forth testimony that supported that theory of defense, and still had a jury simply reject it. You know, counsel, I hear your responses to Judge Hurwitz's question. My biggest problem with this case is someone is on trial for their life. Counsel made what to me are obvious, very basic mistakes, including not putting on an important witness when somebody's on trial for his life. And to me, it's a very difficult question of in those circumstances, the petitioner shouldn't get the benefit of the doubt. I'm sorry, under those circumstances, should the petitioner get the benefit of the doubt? Is that I don't under, it's hard for me to see why the petitioner shouldn't get the benefit of the doubt here. I see your honor. I, I think with this case, it is undoubtedly difficult because it was undoubtedly, undoubtedly close. There was so such overwhelming evidence of guilt. And the real question was the mental state at the time. And the expert in question testified that Mark Rogers did not meet, that Mark Rogers met the legal definition of insanity. The jury has the defense in front of it, and it simply rejected it. Regardless of counsel's potential performance issue, the question is still whether there was a reasonable probability of a different outcome. And I think in light of the facts of this particular case, the nature of the offense, the facts that were before the jury that could allow them to find a guilt verdict and not an for Strickland prejudice. Counsel, I have a technical issue. I realize I'm taking you over your extended time, but just as a technical matter, under Strickland, am I correct in thinking that in both Strickland elements, there's both deficient lawyer performance and second, a reasonable probability of prejudice on both of those are panels supposed to look at the totality of circumstances to make each of those assessments. Yes, your honor. I would agree. Okay. Thank you. I mean, I have no further questions, but if judge for which our judgment want to pose more questions, we'll extend whatever time they want. Absolutely. Thank you, Jessica. Thank you, your honor. Then with that, I would submit and request that the court reverse the district court decision. Okay. Thank you very much. Okay. So the court reporter, Stacy, you're still with us, Stacy. Please note that with commendations to both counsel for their excellent arguments that this case shall now be submitted and the parties will hear from the panel in due course. And we'll go by Zoom to the conference room once the advocates have stepped aside. Thank you both.
judges: Gould, Hurwitz, Bennett